Opinion delivered June 23, 1886.

## [No. 3931.]

### Armstead Watson v. The State.

1. THEFT—PRINCIPAL OFFENDERS—FACT CASE.—See the opinions *in extenso* and the statement of the case for evidence *held*, by a majority of the court, sufficient to support a conviction under an indictment which charges the accused as a principal in the theft of hogs. But see the dissenting opinion of Hurt, Judge, on the questions of principal offenders and accomplices; and note his conclusion that the evidence establishes the guilt of the accused as an accomplice, but not as a principal.

2. SAME—CASES APPROVED.—Note the opinion of Willson, Judge, for an approval of the definition of principal offenders as laid down in the cases of Scales v. The State, 7 Texas Court of Appeals, 361; Cook v. The State, 14 Texas Court of Appeals, 96; O'Neal v. The State, Id., 582; Bean v. The State, 17 Texas Court of Appeals, 60; Wright v. The State, 18 Texas Court of Appeals, 358; M. M. Smith v. The State, *ante* p. 107; Doss v. The State, *ante* p. 505.

APPEAL from the District Court of Houston. Tried below before the Hon. F. A. Williams,

The indictment charged the appellant, Ose Owens and Mose Dickerson jointly with the theft of thirteen head of hogs, of the value of five dollars per head, the property of Joe Long, in Houston county, Texas, on the twenty-fifth day of October, 1883. The defendant being alone upon trial, was convicted, and was awarded a term of four years in the penitentiary.

Joe Long was the first witness for the State. He testified that, in December. 1883, he lost a bunch of from fourteen to sixteen hogs, consisting of barrows, spayed sows, two open sows heavy with pigs, and four shoats. The two open sows were nearly black, and the others were generally black and white spotted. The animals, not including the shoats, were worth in open market at least one hundred and twenty dollars. The shoats returned home after an absence of several days. Witness had seen none of the other hogs since about the first of the said December. The range of the animals covered a radius of half a mile from the witness's house. Until they were missed, the witness saw them regularly as often as two or three times a week. The hogs were fed daily by a little negro boy named Rich, at a point about a half a mile from the witness's house. The hogs were gone but a few days when the witness missed them. Witness made diligent but unsuccessful search for the animals. The said. hogs were taken without the knowledge or consent of the witness, if they had been taken at all. The mark of the witness was a crop and under half crop in each ear. The witness did not examine any of the hog heads found by the officers on the place of the defendant, to see whether or not any of them were in his mark. Defendant lived about four miles from witness. Mose Dickerson lived about two miles from the witness. Either Mose Dickerson or Ose Owens owned a hog dog. Witness had seen Dickerson hog hunting, but had never seen defendant so engaged. Witness had never seen or heard of the defendant being in his hog range.

George Calhoun testified, for the State, that, in November or December, 1883, he lost some hogs from the same range on which Joe Long's hogs ranged. Soon afterwards the witness learned that the officers had found some hogs' heads at defendant's place, and had taken them to Wootters's store, in Crockett. Witness went to that store and saw about twenty heads, the ears on most of them having been recently mutilated. Some few of them were still in the original mark. On some of the heads the witness found one ear in Joe Long's mark, with the mark of the

other ear recently changed. Witness could easily tell the fresh cuts on the ears. The fresh cuts appeared to be about a week old. The heads described had all been salted. On the same day the witness went to defendant's place with the officers, and found some three or four thousand pounds of fresh pork in the defendant's smoke house. Some of that pork was very fresh; some had been killed within a week, some was probably two weeks old, and some was nearly dry. All of the heads witness saw at defendant's house showed the recent disfiguration of the ear marks. Witness found one of his sows and young pigs at defendant's house, and got between six and seven hundred pounds of the pork. Witness saw a great deal of hog hair lying about, showing where the several hogs were killed, the most of which showed the slaughter of black and white hogs. Witness was unable to say that any of the meat he saw at defendant's house was the remains of any of Joe Long's hogs. Ose Owens's house was searched for meat, but none was found that was fresh, and but a small quantity of comparatively old meat. Hilliard and Bettie Rogers were at the defendant's house when witness was there. An officer went with the witness. He had a search warrant, sued out by Bob Barbee. Barbee's hogs were found on the road home.

Justice of the peace Frank Hill testified, for the State, that he issued the search warrant for Barbee to search the defendant's house for pork. On the day that Barbee and the officer brought the hog heads to Wootters's store, the witness met the defendant in Crockett, and defendant told witness about the officer and Barbee taking his meat, and wanted legal proceedings of some kind instituted against them. He told the witness, in that conversation, that the hogs killed by him were raised by him and belonged to him. Witness asked him if he had not bought some of them. He replied that he had "only bought three from Henry Holly." The witness told defendant, in reply, that he, defendant, knew that the hogs did not belong to him; that he, witness, knew who owned them. Witness and defendant then went to Wootters's store, where the hog heads were. Thence the witness went to defendant's house with the officer and Calhoun. He described the condition of the ears on the hog heads, and the incidents of the visit to the defendant's house, and the discoveries made there, substantially as did Calhoun.

Cross-examined, the witness stated that, up to his arrest, the defendant had borne an enviable reputation for honesty. He

had never before been accused of theft, so far as the witness knew. Ose Owens's reputation for truth and veracity was bad, but witness could not say that his reputation for honesty had ever been impeached. The conversation with defendant, recited by witness in his direct testimony, preceded the defendant's arrest a few minutes. Soon after the arrest, witness, Mose Dickerson, George Calhoun, and deputy sheriff Bayne went to the defendant's house. Witness did not know of his own knowledge that the defendant owned any hogs.

Deputy sheriff D. H. Bayne testified, for the State, that in December, 1883, he went with Bob Barbee to the defendant's house to execute a search warrant for the discovery of hogs. They met the defendant on his way to town, for the purpose, he said, of buying salt. Arrived at the defendant's house, witness found defendant's wife, and Howard Rogers and his wife Bettie. They found the clean carcasses of sixteen hogs, recently killed. They were hanging from a pole in the back yard. Witness left orders that the carcasses should not be cut up until he returned. He then went back to town and returned in the evening, when he found that the meat had been cut up and put away in the smoke house. Witness and Barbee, on their morning visit, took several hog heads to town for identification. Witness's statement concerning the discovery of the place of slaughter, ear marks, mutilation of the same, etc., was substantially the same as that of Calhoun. Two of the hog heads, unmutilated, were in the defendant's ear marks. When the witness returned to the defendant's house, in the evening, he asked defendant why, in the face of the orders he left, the carcasses had been cut up. He replied that he cut up the meat because he owned it, and had raised the hogs. Thirteen hog heads were taken to Wootters's store. Some two months before this the defendant told witness that all of his hogs, save three, had died with the cholera.

Cross-examined, the witness said that he had never seen the defendant in Long's range. The carcasses found at the defendant's house were hanging on poles in the yard, exposed to public view.

F. H. Bayne testified, for the State, that he owned hogs which ran on the range with defendant's hogs. He knew what hogs the defendant owned a short time before the disappearance of Long's hogs. During the fall preceding the disappearance of Long's hogs, the defendant had three hogs, one sow, and five or six pigs in his pen. If he owned any other hogs witness did

not know it. Defendant had never, in his several conversations
with witness about hogs, claimed other hogs than those described
by the witness. Witness passed defendant's house about the
time that Long's hogs were missed, and on that occasion saw a
sow in his field which Calhoun afterwards got. Witness met
Ose Owens on that occasion, and on the day before saw Ose
Owens, Mose Dickerson, and Ben Lacey in Long's hog range.
Defendant's character for honesty was good prior to this charge.

Bettie Rogers testified, for the State, that she was living with,
and in the employ of, the defendant in November and December,
1883. On one occasion, a month or two prior to Christmas, 1883,
while the witness, defendant, and witness's husband, Hillard
Rogers, were in the woods sawing board timber, they were
joined by Ose Owens, who called defendant to a distant point,
and engaged him for some minutes in private conversation.
Witness did not know the subject matter of their conversation.
Defendant, when he returned from that private conference with
Owens, told witness and her husband that they could keep on
sawing boards or go back to the house, as they might elect. De-
fendant and Owens then went to the defendant's house. When
they finished the "cut" on which they were then engaged, wit-
ness and her husband went to the house. When the sun was
about one and a half hours high, defendant sent for Hilliard
and then for witness to render aid in penning some hogs. Wit-
ness and her husband responded to the summons, and found the
defendant, Ose Owens, and Mose Dickerson in the lane, with
twelve or fifteen hogs, which they proceeded to pen, driving
them first into a large and then into a small pen. Those pens
belonged to the defendant. Defendant, Owens, and Dickerson
then slaughtered the hogs, and witness, her husband, and de-
fendant's wife assisted in dragging the carcasses to the place
where they were cleaned, which place was in the defendant's
back yard. Scalding box and boiling kettle had already been
prepared, and witness and her husband, as requested by the de-
fendant, helped clean the hogs. The work was concluded about
two o'clock on that night. The bunch of hogs killed on that
night included two open sows heavy with pigs. Several shoats
were drawn into the pen with the bunch killed. Dickerson told
witness's husband that he might have the shoats, but witness
forbade her husband having any thing to do with the shoats,
and they were turned out. The hogs killed were mostly black
and white spotted hogs. Witness did not know how any of them

were marked. Owens and Dickerson left the defendant's house as soon as the work of cleaning and cutting up the meat was over.

The witness was at the defendant's house when the officers came with the search warrant, some two or three weeks afterwards. Several heads were placed in a box, and that box was placed in another box on top of some of the meat. Covy, the defendant's son, when the officers were seen approaching, took his seat on the box and did not move, during this first visit of the officers, and the heads were not discovered. Witness saw Covy cutting the ears on several of the heads after they were cleaned, for which his father, the defendant, whipped him severely. Witness was unable to say how many hogs the defendant owned at the time that the hogs described were slaughtered. He had three in the pen, and, just before the slaughter of the several hogs described, a sow was turned into the field, which was afterwards taken away by Mr. Calhoun. When the officers left, the witness took several of the heads off in a sack for the purpose of burying them. She, however, did not bury them, but took some of them to Stanton's house, finding only Stanton's wife and children at home. The officers got several of the heads. No part of the hogs or meat was owned or claimed by witness or her husband. They were merely in the employ of the defendant, to work on his farm. Ose Owens and Mose Dickerson brought the bunches of hogs to the defendant's house—the bunch described, and another bunch which was turned into the defendant's field, and killed from time to time, as the weather would permit. The defendant claimed to have purchased the hogs brought to his house by Owens and Dickerson.

Ose Owens testified, for the State, that on one Thursday in November or December, 1883, Mose Dickerson came to him where he was chopping wood, and asked witness to go with him to drive some hogs to the defendant's house. Witness declined because busy, but agreed to go with him on the next day. Accordingly, witness and Dickerson met in Crockett on the morning of the next day and repaired to Joe Long's range, between a quarter and a half mile from Long's house. Near the place where Dickerson had said the hogs would be found, witness and Dickerson found a little negro boy, on a gray horse, feeding the hogs. When the boy finished feeding and left, Dickerson followed him to see that he did not return, and witness started the hogs off, using his dog in driving them. Dickerson remained

behind for some time to see that no one followed. He overtook witness at a safe distance, and thence, without trouble or molestation, the hogs were driven to the defendant's house, which was reached late in the evening. Those hogs, to witness's knowledge, belonged to Joe Long. The hogs were penned, slaughtered, cleaned and cut up as related by the witness Bettie Rogers.

Upon their arrival at the defendant's house with the hogs, the witness and Dickerson were told by defendant that he had been waiting for them. Defendant then asked who owned the hogs, and he was told that they belonged to Joe Long. Defendant asked if it was possible or probable that any one saw the hogs taken. He was answered in the negative, and was then informed of the precautions taken in driving. Witness had been told by Dickerson of the division of the meat agreed upon, but, not being satisfied, demanded a restatement of the same while the three parties, himself, Dickerson and defendant, were present. The agreement was stated to be that Dickerson was to drive whatever hogs he could get on the range to defendant's house, where they were to be slaughtered and the meat cured and stored, the defendant to furnish the necessary curing material. Defendant was then to have one half the meat and Dickerson the other half. Witness joined in the enterprise with the understanding that he was to share Dickerson's half. The witness had no personal knowledge of the agreement between defendant and Dickerson before the Long hogs were taken. The kettle, vat, etc., for cleaning purposes, were ready when the witness and Dickerson arrived at defendant's house with the hogs. Defendant and his family, and Hilliard Rogers and his wife, helped witness and Dickerson to clean and cut up the hogs as the same were killed. The work was finished at about two o'clock at night, when witness and Dickerson went home. When witness and Dickerson first reached defendant's house with the hogs, defendant asked why the hogs were not brought there on Wednesday, according to promise. Dickerson replied that the rain prevented. On the morning after the hogs were killed the witness went to Crockett, and on his way met Mr. F. H. Bayne.

The meat was never divided between witness, defendant, and Dickerson, for the reason that the transaction was discovered by the officers, and the owners of the hogs, before the division could be had. Defendant had never paid witness anything for his part of the work described, and, so far as witness knew, had

never paid Dickerson. The officers came to, and searched witness's house for meat, but found only such meat as the witness honestly owned. Witness owned hogs of his own, and had no actual, pressing need of meat, when he went into the enterprise of taking and killing hogs. The witness denied that, shortly after the arrest of the defendant, he said to defendant's wife, in the presence of Wash Lacey: "You know that Mose and I carried the hogs to your house and sold them to the defendant. As there is no chance for him you had just as well let him go on to the penitentiary, and I will assist you to live."

Cross-examined, the witness said that it was his understanding with the prosecuting attorney that the prosecution against him for complicity in this theft was to be dismissed in consideration of his truthful testimony in this case. He had testified fully and truly to every thing he knew. The State closed.

Wash Lacey was the defendant's first witness. He testified that, a few days after the defendant's arrest, Ose Owens said to the defendant's wife, in his presence: "You know that Mose and I carried Joe Long's hogs to your house. Armstead bought them and got the meat. He is now arrested, and I don't see any way to get him out of it. You had just as well let him go on to the penitentiary, and I will assist you in managing to make a living."

James Crowder testified, for the defense, that soon after Long's hogs were said to have disappeared, he saw the defendant, in the town of Crockett, pay Ose Owens and Mose Dickerson some money. He said to Dickerson, as he paid him five dollars: "Now, I guess that settles the hog business." Witness loaned defendant ten dollars, and Wootters changed the bill for him.

Sabe Hackett testified, for the defense, substantially as did Crowder, except that Major Wootters changed the ten dollar bill handed defendant by Crowder, when defendant handed five dollars back to Crowder, and paid the balance to Dickerson. He and Dickerson then retired for a private talk.

J. H. Wootters, testified for the defense, that he had known defendant for fifteen or twenty years, during which time his character for honesty was good. His credit with witness was unlimited, for any reasonable amount. Witness's books showed defendant's accounts for the last six or eight years to run from three hundred to six hundred dollars per annum, all of which, save a balance, had always been promptly paid. Witness's book shows that defendant got forty-six dollars from him in October,

1883, which, as shown by receipt, was for meat. He got fifty dollars from witness on October 29, 1883; ten dollars on November 8, 1883, and one hundred and seventy-nine dollars during the same month. Some time during the said November witness saw the defendant pay Mose Dickerson ten dollars for hogs. Witness was often about the defendant's house, and knew that in the spring and summer of 1883 he owned a good bunch of hogs.

Cross-examined, the witness said that if defendant lost any hogs by cholera or other disease in 1883, he, witness, did not know it. Ose Owens's reputation for truth and veracity was infamous, and witness, from the knowledge of that reputation, would not believe him on oath.

Other witnesses testified as did this witness with regard to Owens's reputation for truth and veracity.

The motion for new trial raised the question discussed in the opinion.

*H. W. Moore* filed an able brief and argument for the appellant.

*J. H. Burts,* Assistant Attorney General, for the State.

WILLSON, JUDGE. In our opinion, the evidence proves that the defendant was a principal in the commission of the theft. It shows that he entered into an agreement with Dickerson, the substance of which was that Dickerson would steal hogs and bring them to defendant's house, where they were to be slaughtered and the meat salted and cured into bacon, and the bacon was to be divided equally between said Dickerson and defendant.

In pursuance of this agreement Dickerson, assisted by Owens, who had been induced by Dickerson to engage in the theft, stole Long's hogs and drove them to defendant's house, where they were penned, slaughtered, and the meat salted and packed away in defendant's smoke house. Defendant was present and assisted Dickerson and Owens in penning, slaughtering, and cleaning the hogs, and in salting and packing away the meat. It is further shown by the evidence that, in pursuance of the agreement between Dickerson and defendant, while Dickerson and Owens were engaged in committing the theft, the defendant was performing the part assigned him, by preparing the pit, fire, pots, kettles, and salt necessary for the accomplisment of the theft,

and without which the theft could not have been so readily and so safely completed.

Although he was not actually present when the hogs were taken, he was engaged in procuring and supplying means to assist in the commission of the offense, while Dickerson and Owens were executing the unlawful act. (Penal Code, Art. 76.)

The learned judge before whom the case was tried delivered to the jury a full and lucid charge, wherein the distinctions between a principal and an accomplice, and between a principal and a receiver of stolen property, were clearly and correctly drawn and explained. He certainly understood the decisions of this court upon this subject as we understand them, and as we believe the law to be. If the previous decisions of this court are not plain with reference to the distinction between a principal and an accomplice, or accessory, we must confess that it is not within the scope of our ability to make it plain. (Scales v. The State, 7 Texas Ct. App., 361; Cook v. The State, 14 Texas Ct. App., 96; O'Neal v. The State, Id., 582; Bean v. The State, 17 Texas Ct. App., 60; Wright v. The State, 18 Texas Ct. App., 358; M. M. Smith v. The State, *ante*, p. 107; Doss v. The State, *ante*, p. 505.)

We have carefully considered other questions raised in the record, and we find no error for which the conviction should be disturbed. The judgment is affirmed.

*Affirmed.*

Opinion delivered June 23, 1886.

## DISSENTING OPINION BY HURT, J.

HURT, JUDGE. This is a conviction for theft of hogs. The main question presented in this case, defendant being indicted as a principal, is whether he is or not a principal.

The theory of this prosecution, stating the case most strongly for the State, is that Mose Dickerson, Ose Owens, and defendant, entered into an agreement, in substance as follows: Owens and Dickerson were to steal hogs generally, bring them to defendant's house, and that all were to assist in dressing the hogs; that defendant agreed to furnish the salt, pack the meat in his smoke house, and hang and cure the same, and that Owens and Dickerson were to get one-half and defendant the other half of the bacon; that in pursuance of this agreement Owens and Dickerson, on or about the twenty-fifth day of October, 1883, went to

the range in which ran the hogs of Long (the prosecutor), and there took the hogs, drove them to the house of the defendant, who lived about four miles from Long's; that on that night they were slaughtered, all the parties assisting; that defendant was expecting these parties to bring the hogs to his house, and was prepared in all respects to slaughter the hogs, and salt away the meat, and that, on the day of the theft by Owens and Dickerson, the defendant was at home engaged in sawing some timber, and hence was not present at, but was absent, about four miles from the taking.

Was he a principal? This is a subject of the greatest importance, for, if indicted as a principal, the party can not be legally convicted as an accomplice, and vice versa. Hence the supreme necessity of a clear and simple definition of principals and accomplices, and especially of the first. And this necessity is intensified by the fact that the prosecuting officers do not seem to understand that more than one count can be inserted in the indictment. Again, I venture the assertion that *under the decisions of this court* upon this subject, there is not a district or county judge in the State who can give in charge to the jury a clear definition of a principal—a charge in which the line is distinctly drawn between principals and accomplices. This subject is left in the utmost confusion, and the writer is as much to blame for this condition of the law upon this subject as any other person.

Who, then, are principals? In M. M. Smith's case, (*ante* p. 107), I held that the first article upon this subject, to-wit, Article 74 of the Penal Code, means the absolute perpetrators of the crime. All persons who are guilty of acting together in the commission of an offense are principals. If we are to construe "acting together" in its broad and most comprehensive sense, then there is no place for Articles 75, 76, and 78, for, most evidently, the person who is present, knowing the unlawful intent of those *actually* engaged in the commission of the unlawful act, is *acting together* with the absolute perpetrator of the crime in one sense, but not in the meaning of Article 74. And so as to the person who, though not present, keeps watch so as to prevent the interruption of those engaged in committing the offense. He, most clearly, is acting together with those who are actually, absolutely, committing the offense. But he is not a principal by virtue of Article 74. And when we look to Article 76 it will be found that the characters there described are not only *acting*

*together* with the absolute perpetrators of the crime, in a certain sense, but these acts must be committed *at the time the unlawful act is done.* Article 78 makes a principal of one who would otherwise be an accomplice but for his presence.

I desire to notice a certain proposition contained in Bean v. The State, 17 Texas Court of Appeals, 60, and the proposition is this: Where the offense is committed by the perpetration of different parts which constitute an entire whole, it is not necessary that the offenders should be *in fact together* at the perpetration of the offense, to render them liable as principals.

This proposition, to me, is in conflict with itself. No offense can be committed by perpetrating *its* different parts, nor can the parts constitute the whole of the offense until the consummating act is done. A. may engage in making preparations for the commission of an offense; he may advise others to its commission; he may furnish the weapons or the means by which others are to commit the offense; but he has not yet committed the offense, nor any part thereof. Again, this rule is without instruction. It teaches us nothing, unless the acts committed by the party sought to be held as a principal are stated. For I hold that each and every act constituting the party a principal is named in the statute. If present, to be a principal, the party must be the actual perpetrator of the crime; or, with knowledge of the unlawful act, he must aid by acts or encourage by words or gestures the actual perpetrators of the crime; or, if not present, he must be keeping watch so as to prevent the interruption of those engaged in committing the offense; or, whether present or not, he must be engaged in procuring aid, arms or means of some kind, to assist in the commission of the offense, and this must be done while others *are executing the unlawful act.* Or, at the time of the commission of the offense he must endeavor to secure the safety or concealment of the offenders. And here I desire to state with emphasis that I know of no other acts which can be committed, whether before or at the time of the commission of the offense, which, if committed by a party, would make him a principal offender.

But let us return to the above proposition contained in the Bean case. This proposition is hinted at by Mr. Greenleaf in his work on Evidence, Volume 3, section 40. He says: "Thus, if several persons set out in concert, whether together or apart, upon a common design which is unlawful, each taking the part assigned to him, some to commit the act and others to watch at

proper distances, to prevent a surprise or to favor the escape of the immediate actors; here, if the act be committed, all are in the eye of the law present and principals; the immediate perpetrators in the first degree, and the others in the second." In this we find acting together,—acts committed at the same time with the main act, and these acts specifically named. And in this we find acts which make the perpetrator a principal specifically named in Articles 75 and 76 of the Penal Code, the only difference being that we have no degrees in principals.

After a most careful consideration of this subject, I contend that, under our statute, the appellant is not a principal; that, beyond any sort of doubt, the evidence shows him to be an accomplice and a receiver of stolen property, but not a principal in the theft.

Let us consult our code and see who are accomplices. Article 79 provides that "an accomplice is one who is not present at the commission of an offense." Now, was this appellant present when the hogs were stolen? By no means. He was four miles from the theft. "But who, before the act is done, advises, commands, or encourages another to commit the offense; or who agrees with the principal offender to aid him in committing the offense, though he may not have given such aid; or who promises any reward, favor, or other inducement, or threatens any injury in order to procure the commission of the offense; or who prepares arms or aid of any kind *prior* to the commission of an offense, for the purpose of assisting the principal in the execution of the same." Note the last clause. If the arms or aid had been prepared or furnished while others were executing the unlawful act, the person preparing or furnishing the same would have been a principal. This by the way.

Now, let us apply the definition of an accomplice to the facts of this case. Defendant was not present. He was not keeping watch. Nor was he engaged in procuring aid or arms or means of any kind to assist in the commission of the theft, while Owens and Dickerson were executing the unlawful act (the theft). Nor did he endeavor at the time of the commission of the theft, to secure the safety or concealment of Owens or Dickerson; hence, he was not a principal. But the facts show that he did agree with, advised, and promised a reward to Owens and Dickerson to procure the theft of Long's hogs. He is most perfectly covered by the code as an accomplice, and if he had been indicted

and convicted as such, no court would be found which, under our statute, would hold the conviction wrong upon this point.

As above stated, this is an important subject, and the rule should be made plain and simple. Suppose the appellant had been indicted as an accomplice, and, upon conviction, had appealed, and had contended before this court, that, if guilty at all, it is as a principal. Now, under the decisions of this court I am afraid that we would have to reverse the judgment. (See M. M. Smith v The State, *ante*, p. 107.)

I am of the opinion that this conviction is wrong, and that the appellant should have been indicted as an accomplice, or a receiver of stolen property.

*Affirmed.*

Opinion delivered June 23, 1886.